UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JACOB PARLIN,<br><br>    Defendant. | Case No. 21-CR-10350-LTS |

MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Jacob Parlin ("Mr. Parlin") respectfully submits this memorandum in support of his Motion to Suppress Evidence and Statements. *See* D.E. 416.

1. **Relevant Alleged Facts**

According to a New Hampshire search warrant affidavit ("affidavit") by Rockingham County Sheriff's Deputy Stephen P. Soares ("Deputy Soares"), on March 30, 2021, the Rockingham County Sheriff's Office Drug Taskforce "was contacted by the Drug Enforcement Agency ("DEA") Boston TDS Group in reference to an individual that was purchasing a large quantity of Methamphetamine." *See* D.E. 416-2 at 8, ¶2. The affidavit states, "*[c]onfidential information* was relayed to the task force that [Mr. Parlin] was going to be purchasing approximately 2 pounds of Methamphetamine in the Boston, MA area, and would be traveling back to the State of Maine." *See id*. (emphasis added). The "confidential information" is never described in the affidavit; moreover, the affidavit is silent concerning the identity of the DEA employee(s) who contacted the Rockingham County Sheriff's Office.

1

The affidavit continues, "DEA advised that [Mr. Parlin] was a known drug user, with an extensive criminal history, and had a suspended driver license out of New Hampshire." *See id*. The affidavit never describes the DEA employee's basis of knowledge that Mr. Parlin is a "known drug user;" moreover, the affidavit is silent on the nature of Mr. Parlin's alleged "extensive criminal history," including whether he had been convicted for any crimes or charged with any drug offenses. Similarly, the basis of knowledge for the DEA's claim that Mr. Parlin "had a suspended driver license out of New Hampshire" was never provided, and Deputy Soares — a local New Hampshire officer — never confirmed it for the affidavit.

DEA TFO Amie Le ("TFO Le") wrote two Reports of Investigation concerning the stop of the black Chrysler ("Chrysler") driven by Mr. Parlin; the first report is dated March 31, 2021, and the second report is dated April 5, 2021. *See* D.E 416-3 ("TFO Le Report 03/31/2021" or "first report"); *see also* D.E 416-4 ("TFO Le Report 04/05/2021" or "second report").[1] The first report fails to mention Mr. Parlin's driver's license status whatsoever. *See* TFO Le Report 3/31/2021. The second report fails to describe any DEA determination concerning Mr. Parlin's license status before the car stop. *See* TFO Le Report 04/05/2021. Moreover, the second report fails to mention any pre-stop communication by the DEA with the Rockingham County Sheriff's Department concerning Mr. Parlin's license status. *See id.* Indeed, the second report only raises the status of Mr. Parlin's license when discussing Mr. Parlin's alleged statement ***following the stop*** that he did not have a driver's license. *See id*. ¶4. Thus, TFO Le's reports contain no evidence that DEA was aware of Mr. Parlin's driver's license status before the car stop.

On March 31, 2021, at approximately 1:00 am, the affidavit indicates, "DEA contacted us again stating that they had just observed the drug transaction take place on the side of the road at

---

[1] TFO Le wrote additional reports in this investigation; however, these two reports address the stop of the Chrysler on March 31, 2021.

2

a location in Boston, MA. DEA advised that [Mr. Parlin] was handed a white bag from their known source and was now headed back to Maine via Rt. 95 N/B. DEA advised that [Mr. Parlin] was driving a black Chrysler 300 ["Chrysler"] bearing Florida Registration DFTK46. We ran the listed registration and noted that it came back to EAN Holdings (Lease Vehicle) . . . DEA advised that they had multiple agents surveilling [Mr. Parlin], and would follow him back to our location." *See* D.E. 416-2 at 8, ¶3. Deputy Soares, who was not present for the alleged "drug transaction," does not describe what information DEA relied upon to conclude it was in fact a "drug transaction," or why they believed the "white bag" contained drugs.[2] As noted, the affidavit only refers to "***[c]onfidential information*** relayed to the [Rockingham County] task force" that a drug transaction was to take place. *See id.* ¶2 (emphasis added).

According to the affidavit, Deputy Lindsey Cunningham of the Rockingham County Sheriff's Office ("Deputy Cunningham") and Deputy Soares met with unidentified DEA agents in Topsfield, MA. *See id*. at 9, ¶4. Deputies Cunningham and Soares located the Chrysler, followed it into New Hampshire, and confirmed that Mr. Parlin was driving with a female in the front passenger seat. *See id*. The female was later identified as A.Y. Additional deputies, Michael Greeley ("Deputy Greeley") and Steven MacPherson ("Deputy MacPherson"), also joined the investigation. *See id*.

The affidavit claims that near the New Hampshire border, "[Mr. Parlin] was traveling at approximately 75 MPH, and in lane 2. As soon as the deputy's cruisers were in view, [Mr. Parlin] slammed on his brakes and moved into lane 1. [Mr. Parlin] then took a hard right into the

---

[2] TFO Le's first report describes a series of wire interceptions alleged to be between Mr. Parlin and codefendant Harry Tam ("Mr. Tam"), and between Mr. Tam and others, in which an alleged drug deal is discussed. As to the white bag, at about 12:08 am on March 31, 2021, agents reportedly observed Mr. Tam enter the backseat of the Chrysler in the area of the Farrington Inn in Boston; Mr. Tam was holding an otherwise non-descript "white bag" when he entered the Chrysler. *See* TFO Le Report 03/31/2021 at ¶13. The first report is silent about whether Mr. Tam still possessed the "white bag" what he left the Chrysler. *See id*. In any case, the affidavit fails to mention any facts to underpin the conclusion that a drug transaction took place.

3

Rt. 95 N/B Seabrook rest stop. Both units and Deputy Cunningham followed the vehicle into the back parking lot of the rest stop. Once in the rear parking lot of the rest stop, [Mr. Parlin] began to pick up speed as if he was going to attempt to evade following Deputies. As [Mr. Parlin] began to exit the rest stop and return back on to Rt 95 N/B Deputy Greely activated his lights and stopped the vehicle." *See id*. ¶5. Neither of TFO Le's reports describe, never mind corroborate, these descriptions of Mr. Parlin's driving movements on I-95 North or at the Seabrook rest stop. *See* TFO Le Report 03/31/2021 and TFO Le Report 04/05/2021.[3] Further, as discussed below, Mr. Parlin was never charged or cited for a motor vehicle offense or infraction.

"According to Deputy Greeley," the affidavit states, "he approached the driver's side of the vehicle and Deputy MacPherson approached the passenger side." *See id*. at ¶6. While neither the affidavit nor the reports state it, the deputies had their firearms drawn and raised in the general direction of Mr. Parlin and A.Y. *See* D.E. 416-5, ¶4. "Deputy MacPherson," on the passenger side of the car, "advised that he asked [Mr. Parlin] for his driver's license." *See* D.E. 416-2 at 9, ¶6. The affidavit states, "[Mr. Parlin] immediately became agitated and he stated that he did not have one. When asked why, [Mr. Parlin] reached ***down behind*** the driver's seat and said, [']I'll show you a driver's license['] in a threatening manner." *See id*. (emphasis added). The affidavit does not describe how Mr. Parlin allegedly reached both "down" and "behind" the driver's seat, nor is it self-evident from the description. *See id*. (emphasis added).[4] In any case, the deputies then ordered Mr. Parlin out of the Chrysler. *See id*. ¶7.

---

[3] The first report describes alleged "counter-surveillance measures" taken by the Chrysler during the course of the drive from Boston to Seabrook; however, these concern the Chrysler's alleged movements on I-93 North and Route 1 North, not I-95 North. *See* TFO Le Report 03/31/2021 at ¶¶14-15. Indeed, the first report fails to mention any unusual driving on 1-95 North whatsoever. *See id*. at ¶¶17-18. Similarly, the second report refers to alleged "counter-surveillance measures" during the drive "from Allston, MA to Seabrook, NH"; however, no specifics are provided, and there is no indication of unusual driving on I-95 North or at the Seabrook rest area. *See* TFO Le Report 04/05/21 at ¶3.

[4] TFO Le wrote that "[Mr. Parlin] was then seen reaching behind the driver's seat," but not down. *See* TFO Le Report 04/05/2021 at ¶4.

4

The affidavit states, "[w]hen [Mr. Parlin] opened the driver[']s side door to get out there was a white bag underneath the driver's seat on the floor with what appeared to be a large amount of white substance." *See id*. Notably, the affidavit fails to indicate who allegedly saw this "white bag" with a "large amount of white substance," or how that person could purportedly see the substance and its color while inside the bag and "underneath the driver's seat." *See id*. According to TFO Le's second report, it was Deputy Greeley who made that observation. *See* D.E. TFO Le Report 04/05/2021 at ¶4. Tellingly, law enforcement did not take a single photograph of the Chrysler, either at the scene or later during the search warrant execution, to demonstrate how anyone could have seen the white bag or its contents beneath the driver's seat. Following the warrant execution, however, A.Y. took photographs of the Chrysler's interior condition. *See* Photographs of Chrysler by A.Y., attached at Ex. A.[5] These photographs strongly suggest that no one would or could see anything beneath the front seats; the front-seat cushions are buttressed by several inches of hard plastic that appear to wrap around the base of the seats close to the floor, preventing easy inspection of anything beneath the seats.

According to the affidavit, "Deputy Greeley searched [Mr. Parlin] and placed him under arrest for [d]riving after suspension, third offense." *See* D.E. 416-2 at 9, ¶7. Notably, as discussed further below, Mr. Parlin was never prosecuted for that offense or any other motor vehicle offense. Moreover, nothing of consequence is reported to have been located on Mr. Parlin during the search of his person.

Then, "[a]ccording to Deputy Greeley, once Jacob sat on the ground, a clear plastic baggie of crystal-like substance fell from his right-side front pocket of his hoodie onto the

---

[5] Although many miscellaneous items can be seen in the footwell of the front passenger seat and throughout the car, at the time of the car stop those items were not in the locations and conditions depicted in the photos. Instead, during the subsequent search by law enforcement, deputies evidently moved and disturbed the items, leaving them in the states and locations depicted in the photographs.

ground." *See id*. The affidavit claims, "Deputy Greeley read [Mr. Parlin] his rights under Miranda. Deputy Greeley asked [Mr. Parlin] if he understood his rights and he said yes. [Mr. Parlin] agreed to speak to Deputy Greeley. Deputy Greeley asked what it was that fell from his pocket and [Mr. Parlin] stated he knew nothing about the baggie," which Greeley believed to be Methamphetamine.[6] *See id.* ¶8. In both reports, TFO Le fails to state that Mr. Parlin was ever provided with his rights under *Miranda v. Arizona*, 384 U.S. 486 (1966). *See* TFO Le Report 03/31/2021 and TFO Le Report 04/05/2021. Mr. Parlin indicates he was never provided with his *Miranda* rights. *See* D.E. 416-5, ¶5.

The affidavit claims the following exchange then occurred: "Deputy Cunningham then spoke to [Mr. Parlin]. Deputy Cunningham asked [Mr. Parlin] if there was anything illegal in the vehicle. [Mr. Parlin] said [']you know what's in there.['] Deputy Cunningham again asked what was in the car, Jacob said, 'there is a few pounds,[] but I'm not letting you search the car.['] Deputy Cunningham explained to [Mr. Parlin] that the Sheriff's Office would be seizing the car and applying for a search warrant." *See* D.E. 416-2 at 9, ¶9; *see also* TFO Le Report 04/05/2021 ¶4.

A K-9 Officer was brought to the scene and the dog allegedly alerted on the "front driver's door area." *See* D.E. 416-2 at 9, ¶10. The affidavit fails to describe the dog's credentials in drug detection.

Later that day, the Rockingham County Sheriff charged Mr. Parlin in Rockingham Superior Court with Possession of a Controlled Drug. *See* Documentation from Rockingham Superior Court, Case No. 218-2021-CR-00343, attached at Ex. B, at 9 ("Waiver of Extradition" describing sole charge as "Poss Control Drug"). Mr. Parlin was never charged or cited with

---

[6] The government has informed the undersigned that the substance in this bag has never been tested.

6

driving with a suspended license or a motor vehicle offense. The Bail Commissioner released Mr. Parlin on personal recognizance with conditions, and the Court scheduled an arraignment hearing for May 6, 2021. *See id*. at 3-4 ("Superior Court Bail Order") and 5 ("Notice of Webex Hearing"). However, on April 13, 2021, the Rockingham County Attorney's Office filed a "Notice of No Charge," and the Superior Court (Ignatius, J.) terminated the case and vacated the bail order. *See id*. at 7.

Although the affidavit is silent on the subject, TFO Le's second report indicates, "[A.Y.] the female passenger identified by Rockingham County, was also placed under arrest for maintaining drug-involved premises." *See* TFO Le Report 04/05/2021 at ¶4. A bail commissioner from the 10th Circuit, District Division, Hampton released A.Y. on personal recognizance with conditions. *See* Circuit Court Bail Order, attached at Ex. C. Revealingly, there is no case number assigned to the matter, *see id*., and no charge against her was ever brought. *See* Declaration of David J. Grimaldi, attached at Ex. D.

Later on March 31, 2021, Deputy Soares submitted his search warrant application and affidavit to the Rockingham County Superior Court (Wageling, J.), where it was granted. *See* D.E. 416-2.[7] The Return indicates that Deputy Cunningham and Soares executed the warrant at about 1:00 pm that day, and inventoried the following items: (1) one half pill of "Pressed Adderall"; (2) two "Large bags of Crystal-like substance 'Meth'"; (3) one bottle cap wit "crystal-like residue;" (4) one "Glass tube with residue"; and (5) the lease agreement to the Chrysler. *See* D.E. at 416-2 at 7. The Chrysler was leased to A.Y.

---

[7] The signed warrant papers, including the warrant signed by the Court, all indicate a submission date of March 31, 2021. However, the government has provided a separate copy of the Application for Search Warrant and Supporting Affidavit, prepared for the Exeter District Court, dated January 12, 2022. *See* Ex. E ("January 2022 warrant documents"). The reason that the January 2022 warrant documents were prepared at all, given that the stop and seizure of the Chrysler occurred nearly nine months before, remains to be seen.

2. **Law and Argument**

    a. **The Stop of the Chrysler**

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *See* U.S. Const. Amend. IV.

A person has a right of privacy in an automobile. *New York v. Class*, 475 U.S. 106, 114 (1986). Roadside traffic stops are analogous to *Terry* stops. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). As such, a police officer who conducts a traffic stop "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion involved. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Under the Fourth Amendment, a traffic stop constitutes a seizure of both the stopped vehicle and its occupants, meaning the stop "must satisfy a standard of objective reasonableness." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014) (citing *Terry*, 392 U.S. at 19.

In this case, the affidavit states, "DEA advised that [Mr. Parlin] . . . had a suspended driver license out of New Hampshire." *See* D.E. 416-2 at 8, ¶2. However, since the affidavit never identifies the DEA employee providing the ***"[c]onfidential information,"*** the information must be treated like an anonymous tip. *See id*. (emphasis added); *see also Alabama v. White*, 496 U.S. 325, 329 (1990) (Factors that are "highly relevant" in determining the value of an anonymous tip are "an informant's 'veracity' 'reliability,' and 'basis of knowledge'") (quoting *Illinois v. Gates*, 462 U.S. 213, 237 (1983). Here, the affidavit never establishes that unidentified

DEA employee's basis of knowledge, reliability, or veracity. Indeed, both of TFO Le's reports fail to indicate any knowledge concerning Mr. Parlin's driver's license status before the stop, and Deputy Soares — a local New Hampshire officer — never indicates he confirmed it before the stop. Since Deputy Soares claims to have relied on a DEA employee's assertion that Mr. Parlin had a suspended license, but TFO Le's reports fail to indicate DEA's prior knowledge of that status and Deputy Soares never confirmed it, the police stop of the Chrysler failed to "satisfy a standard of objective reasonableness." See *Arnott*, 758 F.3d at 43; *see also United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007) (finding police lacked reasonable suspicion where they corroborated only innocent data from anonymous tip, like defendant's identification and whereabouts); *United States v. Roberson*, 90 F.3d 75 (3d Cir. 1996) (finding no reasonable suspicion to conduct investigatory stop where police relied solely on anonymous tip identifying black man in certain attire and location as drug dealer, and where police observed no behavior justifying stop.)

Further, no traffic violation occurred. Neither the affidavit nor TFO Le's reports allege a traffic violation, and no evidence suggests that Mr. Parlin was ever charged or cited with a traffic violation. Indeed, contrary to the affidavit, TFO Le's reports fail to indicate any unusual driving near or within the Seabrook rest area. Since no traffic violation took place, the stop of the Chrysler cannot be justified on that basis.

Based on the foregoing, the warrantless stop of the Chrysler was unconstitutional, and any evidence seized and statements obtained following the warrantless stop must be suppressed.

  b. **The Exit Order and the Arrest of Mr. Parlin**

The accounts of Mr. Parlin's conduct and statements during the warrantless stop are disputed, including his alleged reaching "down" and/or "behind" the seat and the claim that he

9

said [']I'll show you a driver's license['] in a threatening manner." *See e.g.*, D.E. 416-2 at 9, ¶6. First, the affidavit and both reports by TFO Le fail to indicate that deputies had their firearms drawn and pointed at the Chrysler occupants during the warrantless stop at the Seabrook rest area; the credibility of these law enforcement agents' claims, therefore, must be discounted. Second, because law enforcement had drawn and pointed their weapons, it is highly unlikely that Mr. Parlin would have threatened them in the manner suggested. Third, it remains to be seen how Mr. Parlin would reach both "down" and "behind" the seat. Fourth, there was no weapon in the car, and so the necessary foundation of the claimed threat is completely lacking.

Nonetheless, "Deputy Greeley searched [Mr. Parlin]," found nothing of consequence, "and then placed him under arrest." *See id*. ¶7. The affidavit claims the reason for the arrest to be "[d]riving after suspension, third offense," though — as noted above — the affidavit fails to provide the basis of knowledge, veracity, and reliability for the alleged suspension. Further, Mr. Parlin was never charged or cited with that offense or a similar one. Accordingly, the exit order and arrest of Mr. Parlin was unconstitutional, and any evidence seized and statements obtained following the warrantless stop must be suppressed.

    c.  **The Statements**

In *Miranda*, the Supreme Court held that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privileges against self-incrimination." 384 U.S. at 444. Under *Miranda*, law enforcement officers must warn a defendant that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the

10

presence of an attorney, either retained or appointed," prior to the commencement of any interrogation. *Id.* at 444.

In both of her reports, TFO Le fails to state that law enforcement provided Mr. Parlin with his *Miranda* rights before his custodial interrogation following his arrest. TFO Le Report 03/31/2021 and TFO Le Report 04/05/2021. Further, Mr. Parlin states that he was never provided his *Miranda* rights at the scene. *See* D.E. 416-5, ¶5. Nonetheless, the affidavit claims that, following Mr. Parlin's arrest, "Deputy Greeley read [Mr. Parlin] his rights under Miranda." *See* D.E 416-2 at 9, ¶8. This Court should rule that law enforcement never provided Mr. Parlin with his *Miranda* rights and suppress his post-arrest statements during his custodial interrogation. If necessary, the Court should schedule an evidentiary hearing to resolve the factual dispute concerning whether his *Miranda* rights were provided prior to custodial interrogation.

d.  **The Seizure of the Chrysler**

There was no legal justification for the warrantless seizure of the Chrysler. First, as noted, Rockingham County Sheriff's Deputies relied on "*[c]onfidential information*" from an unidentified DEA employee concerning the alleged drug transaction, *See* D.E. 416-2 at 8, ¶2 (emphasis added). Confidential information without supporting evidence of veracity, reliability, and a basis of knowledge cannot support a seizure. *See Illinois v. Gates*, 462 U.S. at 237.

Second, without the statements to be suppressed due to the *Miranda* violation, no evidence exists there were any controlled substances inside of the Chrysler. As to the "white bag," the affidavit fails to describe any evidence that the unidentified DEA employee relied upon to conclude that it contained drugs. Further, the decision by Rockingham County Sheriff's Deputies ***not*** to photograph the Chrysler, either at the scene or during the search warrant

11

execution, suggests they could not see a "white bag underneath the driver's seat on the floor with what appeared to be a large amount of white substance," as claimed in the affidavit. *See* D.E. 416-2 at 9, ¶7. Otherwise, they would have photographed it. Moreover, the mere fact that Rockingham County applied for a search warrant supports that they did not make a "plain view" observation of drugs, as such an observation would obviate the need of a warrant. Indeed, as the photographs taken by A.Y. suggest, it is very unlikely that they ever could have made an observation of any items beneath the front seats of the car. *See* Ex. A.

Third, there was no justification to arrest Ms. A.Y., who was never charged with a crime, and she should have been permitted to drive the Chrysler away. Indeed, the evidence strongly suggests that law enforcement arrested him/her without any intent to charge him/her; instead, it appears they arrested A.Y. so that he/she would not be permitted to leave with the Chrysler. The single "offense" listed on his/her bail order is "Control Drug Premises." *See* Ex. C at 2. The New Hampshire statute concerning that offense states, in relevant part, "[a] person shall be guilty of a misdemeanor who . . . Controls any premises or vehicle where he **knows** a controlled drug or its analog is illegally kept or deposited." *See* NH Rev Stat § 318-B:26(III)(a) (2015) (emphasis added). There is no probable cause to believe that A.Y. knew a controlled drug was inside the Chrysler. Indeed, it is unclear which package A.Y. was purported to have "controlled" inside the Chrysler. Even Mr. Parlin had not been charged with the package later seized from beneath his seat (indeed, at the time of her arrest, the search of the Chrysler pursuant to the warrant had not occurred yet); moreover, there is no evidence that A.Y. knew about the small bag of alleged drugs that purportedly fell from Mr. Parlin's "right-side front pocket" following his arrest. *See* D.E. 416-2 at 9, ¶7. Simply put, at the time of A.Y.'s arrest, there was no probable cause to

believe that he/she knew of a controlled drug inside of the Chrysler, and he/she appears to have been arrested on false pretenses to prevent him/her from driving away the car away.

Based on the foregoing, the warrantless seizure of the Chrysler was unconstitutional.

    e. **The Search Warrant**

        i. **Lack of Probable Cause**

As noted, the Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *See* U.S. Const. Amend. IV. "Probable cause exists when 'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.'" *See United States v. Schaefer,* 87 F.3d 562, 565 (1st Cir. 1996), quoting *United States v. Aguirre,* 839 F.2d 854, 857–58 (1st Cir.1988). "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge, and of which they have reasonably trustworthy information, (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *See Brinegar v. United States*, 338 U.S. 160, 175-76 (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925); *see also United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (same).

As discussed above, the affidavit never identifies the DEA employee providing the ***"[c]onfidential information,"*** the information must be treated like an anonymous tip. *See* D.E.416-2 at 8, ¶2 (emphasis added). Factors that are "highly relevant" in determining the value of an anonymous tip are "an informant's 'veracity' 'reliability,' and 'basis of knowledge.'" *See Alabama v. White*, 496 U.S. at 329, quoting *Illinois v. Gates*, 462 U.S. at 237. Here, the affidavit never establishes that unidentified DEA employee's basis of knowledge, reliability, or veracity

13

on several issues, including the claim that a drug transaction had just occurred and the suggestion that those drugs would be present inside the Chrysler. For those reasons, the warrant is not based upon probable cause and the evidence must be suppressed.

### ii. **An Evidentiary Hearing under *Franks v. Delaware***

In *Franks v. Delaware*, the Supreme Court held that under the Fourth and Fourteenth Amendments, "a challenge to a warrant's veracity must be permitted" in some circumstances. *See* 438 U.S 154, 164 (1978). "'[W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing.' This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct . . . But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *See id.* at 164-5, quoting *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported) (emphasis in original).[8]

Defendants requesting a *Franks* hearing "must make a 'substantial preliminary showing' that the affidavit included a false statement which was made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause." *United States v. Nelson-Rodriguez*, 319 F.3d 12, 34 (1st Cir. 2003) (citing *Franks*, 438 U.S. at 155-56; *United States v. Adams*, 305 F.3d 30, 36 n.1 (1st Cir. 2002)). "A material omission in the affidavit may also qualify for a *Franks* hearing in place of a false direct statement, provided the same requisite showing is made." *Id*. (citing *United States v. Scalia*, 993

---

[8] The *Franks* Court noted, "[b]ecause it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *See id*. at 165.

F.2d 984, 987 (1st Cir. 1993)); see also *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987).

The First Circuit has stated that "[b]oth *Franks* and our own related precedent suggest that any suppression should be ordered . . . if the warrant application, cleansed of any false information or clarified by disclosure of previously withheld material, no longer demonstrates probable cause." *United States v. Stewart*, 337 F.3d 103, 105 (1st Cir. 2003) (citing *Franks*, 438 U.S. at 156).

In this case, Mr. Parlin has made a substantial preliminary showing that Deputy Soares included false statements in the affidavit that were made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause. First, the affidavit claims that "DEA advised that Jacob was handed a white bag from their known source" during the putative drug deal. *See* D.E. 416-2 at 8, ¶3.  However, TFO Le's first report, which discusses the DEA's observations, is silent about whether Mr. Tam still possessed the "white bag" what he left the Chrysler. *See* TFO Le Report 03/31/2021 at ¶13. Thus, there was no evidence that Mr. Parlin "was handed a white bag from their known source" as claimed in the affidavit.

Relatedly, Rockingham County's failure to photograph the Chrysler, either during the car stop or during the warrant execution, to illustrate how a deputy supposedly observed "a white bag underneath the driver's seat on the floor with what appeared to be a large amount of white substance," *see* D.E. 416-2 at 9, ¶7, supports the substantial preliminary showing under *Franks*. Indeed, the photographs of the Chrysler by A.Y. severely undermine the credibility of the affidavit's claims. They would only know about any white bag underneath the seat by searching the car without a warrant.

Further, the statements that the affidavit attribute to Mr. Parlin support the substantial preliminary showing. For example, Mr. Parlin would have little reason to deny possession of the ***small*** bag of drugs that allegedly fell out of his pocket, but then supposedly admit that "***there is a few pounds***" in the car. *See* D.E. 416-2 at 9, ¶¶7, 9 (emphasis supplied). Further, it makes no sense that Mr. Parlin would have admitted to a "few pounds" in the car, but Rockingham County would still apply for a warrant.

Moreover, TFO Le's failure to corroborate the affidavit's claims concerning Mr. Parlin's alleged behavior while driving on I-95 North and within the Seabrook rest stop further support the affidavit's inclusion of deliberate or reckless misstatements. *Compare* D.E. 416-2 at 9, ¶5 with TFO Le Report 03/31/2021 and TFO Le Report 04/05/2021. Moreover, the affidavit's failure to mention that deputies had drawn and raised their firearms during the encounter reveals an intent to deceive their actions.

Based on the foregoing, the Court should allow the motion to suppress or grant a *Franks* hearing.

3. **Conclusion**

For the reasons stated herein, Mr. Parlin respectfully requests the Court allow Mr. Parlin's Motion to Suppress Evidence and Statements. *See* D.E. 416.

DATE: August 4, 2023,                              Respectfully Submitted,
                                                   JACOB PARLIN
                                                   By his attorney:

                                                   /s/ David J. Grimaldi
                                                   David J. Grimaldi (BBO # 669343)
                                                   David J. Grimaldi, P.C.
                                                   929 Massachusetts Avenue, Suite 200
                                                   Cambridge, MA 02139
                                                   Tel: 617-661-1529
                                                   Fax: 857-362-7889
                                                   david@attorneygrimaldi.com

Certificate of Service

    I, David J. Grimaldi, do hereby certify that true copies of this filing were served on all registered participants by CM/ECF this 4th day of August 2023.

                                              /s/ David J. Grimaldi
                                              David J. Grimaldi