| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JACOB PARLIN,<br><br>　　　　Defendant. | Case No. 1:21-CR-10350-LTS-10 |

**MOTION FOR DOWNWARD DEPARTURE OR VARIANCE**

　　　　Defendant Jacob Parlin ("Mr. Parlin") respectfully moves this Honorable Court for a departure or variance from the advisory sentencing guidelines and requests that the Court use the "methamphetamine" rather than "methamphetamine actual" guidelines under USSG §2D1.1(c).

1. **Relevant Facts**

　　　　When Mr. Parlin was stopped by law enforcement in Seabrook, New Hampshire on March 31, 2021, he had just left a meeting with Harry Tam ("Mr. Tam") in Allston, MA. *See* PSR ¶ 9. Although the methamphetamine found in the car tested positive for approximately 100% purity, no dilutant or "cut" was located. Instead, law enforcement found many items consistent with personal use in the car, including the following:

- "[H]alf of a small orange pill" that "resembled a placebo style Adderall pill that we have recently seen which is known to be 'pressed' Methamphetamine."

- "[A] small bottle cap with white powder residue that was consistent with a device used to prepare narcotics for intravenous use."

- "[A] glass smoking pipe."

- "[A] used Hypodermic Needle."

1

- "[S]everal $1.00 bills . . . that had been rolled up," a "very common for drug users to do as a method of snorting drugs."

*See* Police Report by Deputy Sheriff Soares of the Rockingham County Sheriff's Department, attached at Exhibit A.

As to March 11, 2021, Mr. Parlin objects to being held accountable for the purported 1.3 kilograms of methamphetamine for the reasons stated in his Sentencing Memorandum. However, even as to the purported 1.3 kilograms:

- The items or substance was never provided to Mr. Parlin.
- The items or substance were never seized by law enforcement.
- The items or substance was never tested to determine its identity or purity.

2. **Law and Argument**[1]

This Court should join the growing number of District Courts from throughout the country in rejecting the purity-driven methamphetamine sentencing guideline, and sentence Mr. Parlin using the "methamphetamine" rather than the "methamphetamine (actual)" guideline. *See* USSG §2D1.1(c); *see also United States v. Celestin*, 2023 WL 2018004 (E.D.LA.) (2/15/23); *United States v. Havel*, 2023 WL 1930686 (D. NE.)(2/10/23); *United States v. Robinson*, 2022 WL 17904534 (S.D. MI.)(12/23/22); *United States v. Carrillo*, 440 F. Supp. 3d 1148, 1157 (E.D. CA. 2020); *United States v. Moreno*, 583 F. Supp. 3d. 739, 741 (W.D. VA 2019); *United States v. Rodriguez*, 382 F. Supp. 3d 892, 893 (D. AK. 2019*); United States v. Johnson*, 379 F. Supp. 3d 1213, 1225 (M.D. AL 2019); *United States v. Bean*, 371 F. Supp. 3d 46 (D. N.H. 2019);

---

[1] This argument owes an obvious debt to the "Motion for Departure from Meth Actual Guideline" (D.E. 578) filed by counsel for Mr. Tam, as well as "Defendant's Motion Requesting the Court to Declare a Categorical Policy Disagreement with the Purity-Driven Methamphetamine Guidelines," and supporting pleadings, in the case of *United States v. Nathan Boddie*, 1:23-cr-10031-IT (*See* D.E. 90 through 91-2, 108). The arguments from those pleadings apply with similar force to the instant case and are borrowed from generously here.

*United States v. Pereda*, 2019 WL 463027 (D. CO.)(2/16/19); *United States v. Nawanna*, 321 F. Supp 3d 943 (N.D. IA. 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 971-974 (N.D. IA 2018); *United States v. Ferguson*, 2018 WL 3682509 (D. MN.)(8/2/18); *United States v. Saldana*, (No. 17CR271-1 W.D. MI.)(7/3/18); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255-257 (D. N.M. 2017).

    a. **The Court is Authorized to Vary Downward on Policy Grounds.**

This Court's authority to vary from the advisory guidelines on policy grounds and grant the relief requested is settled law. *See Kimbrough v. United States*, 552 U.S. 85, 105-107 (2007). A sentencing court may reject a guideline on a categorical basis and "not simply based on an individualized determination that [it] yield[s] an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009) (per curiam); *see also United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) (reaffirming district court's authority to vary from guideline on a categorical policy disagreement; procedural error if court fails to recognize discretion to vary from guideline range based on a categorical policy disagreement).

    b. **The Court Should Depart or Vary Downwards on Policy Grounds.**

As a growing number of District Courts have before it, this Court should depart for vary from the purity-driven methamphetamine guidelines on policy grounds. First, there is no empirical basis for the 10:1 ratio of methamphetamine mixtures to "actual" methamphetamine embodied in the guidelines. Second, any logical grounds for using the purity of methamphetamine as a proxy for a defendant's role in the offense or proximity to the source of the drugs have vanished over time since virtually all methamphetamine illegally sold in the United States in recent years exceeds 90 percent in purity. Third, this irrational purity enhancement has the effect of treating defendants convicted of methamphetamine offenses under

3

the guidelines far more harshly than defendants convicted of conspiring to distribute or distributing other illegal drugs, including drugs that are more dangerous. Fourth, the purity enhancement means that the base offense level in methamphetamine cases will vary dramatically depending on whether or not the government chooses to test the seized drugs for purity or whether that testing can be completed prior to sentencing. This results in arbitrary and capricious distinctions among similarly-situated defendants. Finally, the irrational purity enhancement for methamphetamine effectively undermines the statutory sentencing objectives set forth at 18 U.S.C. §3553(a).

    i. <u>There is no empirical basis for the 10:1 ratio embodied in the methamphetamine guidelines.</u>

  The base offense level for methamphetamine offenses under the sentencing guidelines is derived from the Drug Quantity Table set forth at U.S.S.G. §2D1.1(c). Note (B) to that table directs the Court to use the offense level determined by the entire weight of a mixture containing methamphetamine or the offense level determined by the weight of actual methamphetamine or "ice," whichever is greater. Note (C) to the Drug Quantity Table defines "ice" as a mixture containing methamphetamine of at least 80% purity. The Table establishes a 10:1 ratio in its treatment of quantities of methamphetamine mixtures on one hand and actual methamphetamine or "ice" on the other. Thus, the very same base offense level applies to a particular quantity of actual methamphetamine or ice and to ten times that quantity of a mixture containing methamphetamine.

  It is well-settled that the Sentencing Commission departed from an empirical approach in setting the guidelines ranges for drug offenses in 1989, choosing instead to key the guidelines to the statutory minimum sentences that Congress had established for such crimes in 1988. See e.g. *Gall v. United States*, 552 U.S. 38, 46 n. 2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96

(2007). As the Court observed in *Bean*, "many courts have noted that no empirical data appears to justify the guidelines' 10:1 ratio." 371 F. Supp. 3d at 51; *see also United States v. Ferguson*, 2018 WL 3682509 (D. MN.) (8/2/18) at *3; *United States v. Hartle*, 2017 WL 2608221 (D. ID.) (2/15/17) at *2 ("I have tried to determine whether there is any empirical data from the Sentencing Commission or in the academic literature which would justify the [10:1] ratio. I have found none.").

    ii. <u>The purity of methamphetamine does not serve as a rational proxy or indicator of a defendant's role in the drug distribution chain or proximity to the drug supply.</u>

The sole rationale for using purity as a relevant variable in methamphetamine cases appears in Comment 27(C) to U.S.S.G. §2D1.1. That comment states that the purity of a controlled substance "may be relevant in the sentencing process because it is probative of the defendant's role and position in the chain of distribution. Since seized controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." Over time, however, this premise has dissolved into a pretext for ratcheting up the guidelines calculation for methamphetamine offenses. "Today, methamphetamine is almost always imported from foreign drug labs and the purity levels are much higher." *Hartle*, 2017 WL 2608221 at *2. According to the DEA, the average purity of methamphetamine in the United States between 2012 and 2017 was over 90%. *Bean*, 371 F. Supp. 3d at 52. See also Table of Drug Purity set forth in *United States v. Nawanna*, 321 F. Supp. 3d 943, 952 (N.D. IA. 2018). As one district court recently stated: "The fact is – and there doesn't seem to be much disagreement on this point – that nearly all of the methamphetamine that's actually tested in relation to federal drug crimes is highly

pure." *United States v. Havel*, 2023 WL 1930686 (D. NE.) (2/10/23) at *5. Thus, for at least the last decade, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D. NM. 2017). As the Court put it in *Bean*: "In effect, the, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true." 371 F. Supp. 3d at 53.

      iii. <u>The purity-driven methamphetamine guidelines are unduly harsh when compared to those for other drug offenses.</u>

The multiplier embodied in the guidelines for "pure" or "actual" methamphetamine or "ice," now applicable to virtually every methamphetamine case, means that "[m]ethamphetamine offenses receive more severe sentences than any other drug." *Bean*, 371 F. Supp. 3d at 53. Thus, for example, the 882.8 grams of methamphetamine (actual) seized on March 31, 2021 in this case would trigger a base offense level of 34. *See* U.S.S.G. §2D1.1 (c)(3). That same quantity of cocaine base would trigger a base offense level of 32. *See* §2D1.1 (c)(4). That same quantity of fentanyl would trigger a base offense level of 30. §2D1.1 (c)(5). That same quantity of heroin would trigger a base offense level of 28. §2D1.1 (c)(6). That same quantity of cocaine would trigger a base offense level of 24. §2D1.1 (c)(8). The arbitrary unfairness of these unwarranted disparities is self-evident and pernicious. Moreover, although all these drugs pose dangers, heroin, fentanyl, and cocaine base are typically more dangerous than methamphetamine.[2]

      iv. <u>The purity-driven guidelines lead to arbitrary and capricious results since their application is dependent on the seizure and testing of suspected drugs.</u>

---

[2] *See e.g.*, https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf?utm_source=STAT+Newsletters&utm_campaign=11d2e719c6-MR_COPY_12&utm_medium=email&utm_term=0_8cab1d7961-11d2e719c6-149867653 (last viewed May 13, 2024) (CDC reports that "in 2016, the drugs most frequently mentioned in unintentional drug overdose deaths were fentanyl, heroin, and cocaine," the latter of which included "cocaine crack.")

6

The purity enhancement means that the base offense level in methamphetamine cases will usually vary dramatically depending on whether or not the government chooses to test the seized drugs for purity or whether that testing can be completed prior to sentencing. This results in arbitrary and capricious distinctions among similarly-situated defendants.

      v. <u>The purity-driven methamphetamine guidelines undermine the statutory sentencing objectives embodied in 18 U.S.C. §3553(a).</u>

The artificially-inflated guidelines for "methamphetamine (actual)" applicable to virtually every such case consistently yield sentences greater than necessary to achieve the purposes of §3553(a) since those guidelines treat all methamphetamine defendants like drug kingpins. *Havel*, 2023 WL 1930686 at *5. The statute specifically articulates "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct...." 18 U.S.C. §3553(a)(6). Yet the purity-driven methamphetamine guidelines direct the Court to begin its sentencing analysis with an irrational and unfair disparity between defendants convicted of methamphetamine offenses and those convicted of other drug offenses. Such a disparity should not be countenanced.

Section 3553 also instructs sentencing judges to impose a sentence "sufficient, but not greater than necessary," to effectuate its objectives. The methamphetamine guidelines, if followed, compel the Court to start the process with an artificially high sentencing range, necessitating a variance in every case to lower the sentence to a reasonable level. That is not how the process is supposed to work.

    c. **<u>A Growing Number of District Courts Across the Country have Declared a Categorical Policy Disagreement with the Methamphetamine Guidelines.</u>**

At least 14 district courts throughout the United States have declared a categorical policy disagreement with the purity-driven methamphetamine guidelines during just the past six years.

*See United States v. Celestin*, 2023 WL 2018004 (E.D.LA.) (2/15/23); *United States v. Havel*, 2023 WL 1930686 (D. NE.)(2/10/23); *United States v. Robinson*, 2022 WL 17904534 (S.D. MI.)(12/23/22); *United States v. Carrillo*, 440 F. Supp. 3d 1148, 1157 (E.D. CA. 2020); *United States v. Moreno*, 583 F. Supp. 3d. 739, 741 (W.D. VA 2019); *United States v. Rodriguez*, 382 F. Supp. 3d 892, 893 (D. AK. 2019*); United States v. Johnson*, 379 F. Supp. 3d 1213, 1225 (M.D. AL 2019); *United States v. Bean*, 371 F. Supp. 3d 46 (D. N.H. 2019); *United States v. Pereda*, 2019 WL 463027 (D. CO.)(2/16/19); *United States v. Nawanna*, 321 F. Supp 3d 943 (N.D. IA. 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 971-974 (N.D. IA 2018); *United States v. Ferguson*, 2018 WL 3682509 (D. MN.)(8/2/18); *United States v. Saldana*, (No. 17CR271-1 W.D. MI.)(7/3/18); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255-257 (D. N.M. 2017).

In this District, Judge Casper took the same position in the context of sentencing the defendant in *United States v. Peter Lobo*, No. 17 10063-DJC. *See* Sentencing Transcript (11/29/17), pp. 23-24, attached hereto at Exhibit B ("[T]o the extent there was an enhancement because of the purity of the methamphetamine, which now appears to be the market standard, I don't think that enhancement or that further enhancement is appropriate here.").

All of these courts employed similar reasoning and legal analysis to reach the same conclusion – that the current methamphetamine guidelines should be rejected on policy grounds and an appropriate variance should be adopted and applied in sentencing all defendants convicted of methamphetamine offenses. As the Court in *Bean* stated, this is "a policy-based variance that is wholly independent of the individual defendant's unique circumstances and characteristics." 371 F. Supp. 3d at 55.

> d. **Applying the Methamphetamine Mixture Guidelines in all Methamphetamine Cases is an Appropriate Variance or Departure.**

Virtually all of the courts that have rejected the current purity-driven methamphetamine guidelines have concluded that the appropriate remedy is to apply the methamphetamine mixture guidelines instead. In *Bean*, the Court cited the Supreme Court's decision in *Spears* in rejecting a case-by-case approach "that collapses [the Court's] policy disagreement into its individualized determination [of an appropriate sentence in a particular case]." 371 F. Supp. 3d at 55. Rather, the Court concluded, "maximum transparency" is achieved if the guidelines are recalculated using the base offense level for the methamphetamine mixture guidelines in every methamphetamine case before an individualized assessment of the defendant takes place. *Id.* The same approach (substituting the methamphetamine mixture guidelines for the purity-driven guidelines) was adopted in *Celestin*, *Havel*, *Rodriguez*, *Moreno*, *Harry,* and *Saldana*. In most of the other cases cited above, the sentencing court applied the methamphetamine mixture guidelines in a particular case without proclaiming that it would necessarily do so in every methamphetamine case going forward. But the effect was the same.

    e. **Applying the Methamphetamine Mixture Guidelines in Mr. Parlin's Case is an Appropriate Variance or Departure.**

This Court should also vary or depart downward to the methamphetamine mixture guidelines for reasons specific to Mr. Parlin's circumstances. The methamphetamine that police seized on March 31, 2021 was in exactly the same condition, and at exactly the same level of purity, as when Mr. Tam gave it to him. *See* PSR ¶9. Crucially, Mr. Parlin had no connections with Mr. Tam's drug contacts in California. Moreover, Mr. Parlin had no dilutants or "cut" with him during the car stop, and there is no evidence that he possessed any at any time.

As to the earlier date of March 11, 2021, the government concedes that no items or substances were provided to Mr. Parlin, seized by law enforcement, or tested by a laboratory for

9

purity. *See* PSR ¶11. It would be wholly inappropriate to apply "methamphetamine (actual)" guidelines against Mr. Parlin in such circumstances. Indeed, the probation department rejected the use of the "methamphetamine (actual)" guideline in the case of codefendant Robert Ostrander where, just as on March 11, 2021, "there was no seizure." *See* D.E. 481 at 1-2; *see also* D.E. 479 at 3 (government complains that Mr. Ostrander's PSR "ignores that virtually all methamphetamine seized from this conspiracy tested as actual methamphetamine." *See* D.E. 479 at 3). Moreover, "the government *itself* agreed it was appropriate to use the [methamphetamine (mixture)] guideline in the Eli Sanders case." *See* 481 at 1-2, citing D.E. 193-1, ¶4 ("Plea Agreement" with Mr. Sanders employing the "methamphetamine" instead of "methamphetamine (actual)" guideline). The Court appears to have sentenced Mr. Ostrander and Mr. Sanders consistent with the "methamphetamine" mixture guidelines. To be sure, for the reasons stated in his Sentencing Memorandum, Mr. Parlin is not accountable for the purported items purportedly at issue on March 11, 2021. However, even if he was, the "methamphetamine" rather than "methamphetamine (actual)" guideline should be used like with Mr. Ostrander and Mr. Sanders.

The PSR confirms that, prior to the instant case, Mr. Parlin had never been convicted of a drug offense. *See* PSR at Part B. Instead, Mr. Parlin is defendant number 10 in a 10-defendant indictment, and a drug addict. The PSR confirms Mr. Parlin's "history of chronic substance abuse," including methamphetamine abuse at 12 years-old. *See* PSR ¶¶79-86. "In 2004, he began using meth daily." *See* PSR ¶85. The evidence confirms that Mr. Parlin was consumed by methamphetamine abuse at the time of the instant offense. *See* Exhibit A. He snorted, smoked, swallowed, and shot the drug intravenously, and possessed all of the methods of doing so in the car stopped on March 31, 2021. *See id*.

Whether or not this Court declares a policy disagreement with the purity-driven

10

guidelines in all methamphetamine cases, the circumstances of Mr. Parlin's case support a downward departure or variance. "[T]he purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true." *United States v. Bean*, 371 F. Supp. 3d at 53. It is definitely not true in Mr. Parlin's case. This Court should depart or vary downward to the methamphetamine (mixture) guidelines.

3. **Conclusion**

Based on the foregoing, Mr. Parlin respectfully requests that this Honorable Court GRANT the instant motion for a downward departure or variance.

DATE: March 15, 2024                                                    Respectfully Submitted,
                                                                        JACOB PARLIN
                                                                        By his attorney:

                                                                        /s/ David J. Grimaldi
                                                                        David J. Grimaldi (BBO # 669343)
                                                                        David J. Grimaldi, P.C.
                                                                        929 Massachusetts Avenue, Suite 200
                                                                        Cambridge, MA 02139
                                                                        Tel: 617-661-1529
                                                                        Fax: 857-362-7889
                                                                        david@attorneygrimaldi.com

CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this memorandum were served on all registered participants via CM/ECF this 14th day of March 2023.

                                                                        /s/ David J. Grimaldi
                                                                        David J. Grimaldi